## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHESTERTON CAPITAL LLC,<br>Plaintiff,<br><br>v.<br><br>LEGACY POINT CAPITAL LLC,<br>BYRON L. HOLLEY and JOHN C.<br>LOUDON,<br>Defendants. | Civil Action No.   1:16-cv-10848-LTS |

## PLAINTIFF'S MOTION FOR SANCTIONS AND REQUEST FOR ORDER OF DISMISSAL OF COUNTERCLAIMS

### (Memorandum of Law Incorporated)

Chesterton Capital LLC ("Chesterton") hereby moves for sanctions against the

Defendants Legacy Point Capital, LLC ("Legacy"), John C. Loudon ("Loudon"), and Byron L.

Holley ("Holley") (collectively "Defendants") for the following reasons:

> (1) Loudon has committed a fraud on the Court by advancing a frivolous defense and counterclaim concerning the personal guaranty that he and Holley executed in favor of Chesterton in October of 2012.  Loudon's claim, that Chesterton and/or Brensley fraudulently doctored the guaranty after he signed it in October 2012, is directly contradicted by emails recently discovered on Holley's laptop, which Loudon authored and sent to Holley, and which establish that it was Loudon who made the final changes to the guaranty which he now claims were doctored by others and directed Holley to sign it.  Loudon and Holley both knowingly refused to produce these emails during discovery.

> (2) Holley has committed fraud on the Court by knowingly providing false statements and shifting explanations concerning the Wells Fargo statement that Holley presented to Chesterton in 2012 as purported proof that his net worth exceeded $3 million.  This account statement forms a central basis for Chesterton's lawsuit, yet Holley first refused to provide discovery related to this document, then provided false and misleading discovery responses, all of which forced Chesterton to take third party depositions

and to schedule various motion hearings and status conferences with the Court.  The recently completed forensic examination of Holley's computer confirms that Holley had possession of the Wells Fargo account statement and related emails on his computer, even after Chesterton filed this lawsuit in 2016, but that the account statement was deleted from his computer on or around June 20, 2016, after Chesterton served Holley, and that he refused to produce the other emails related to his financial disclosure.

(3) As confirmed by the recently completed inspection of Holley's computer, Holley and Loudon knowingly failed to produce other critical emails that directly undercut their defenses and counterclaims, and which establish that Holley and Loudon perjured themselves during various depositions, and gave false and misleading testimony directly to the Court during status conferences and through sworn affidavits.

(4) Holley spoliated evidence by failing to preserve and produce text messages he exchanged with Loudon in 2012, despite acknowledging that his text data was ported onto his current cell phone.  Holley and Loudon also spoliated other evidence, including emails and documents deleted from Holley's Toshiba laptop, which was only made available after an Order from this Court forced Holley to locate and produce the computer for inspection.  Holley also informed the Court that he likely stopped using the Toshiba laptop at some point in 2013, yet the forensic examination confirmed that he continue to use the computer through September 2016, approximately five months after Chesterton filed this lawsuit.

As explained in detail in this motion, severe sanctions are warranted for this egregious conduct, all of which has needlessly wasted Chesterton's and the Court's valuable time and resources, prolonged this litigation, and caused Chesterton to incur substantial legal fees and costs.  Specifically, Chesterton seeks an order of sanctions (1) dismissing with prejudice all of the Defendants' Counterclaims against Chesterton, (2) awarding Chesterton its costs and fees incurred in relation to the discovery and motion practice necessitated by the Defendants' frivolous defenses, claims, and discovery abuses, (3) permitting Chesterton to instruct the jury with an adverse inference instruction, specifically concerning the Defendants' spoliation and failure to produce relevant documents, and (4) preventing Loudon, Legacy and Holley from

offering into evidence any documents or emails located from the recently completed forensic inspection of Holley's laptop.

## ARGUMENT

**I.     LOUDON AND HOLLEY HAVE COMMITTED FRAUD ON THE COURT BY ADVANCING KNOWINGLY FRIVOLOUS CLAIMS AND DEFENSES AND UNNECESSARILY CAUSING CHESTERTON AND THE COURT TO WASTE VALUABLE RESOURCES ON DISCOVERY MATTERS**

Fraud on the court has its genesis in the federal court's inherent power to regulate and control abusive litigation tactics effecting the institutional integrity of the court. *Davidson v. Cao*, 211 F. Supp. 2d 264, 276 (D. Mass. 2002). A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense. *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (fraud on the court found where plaintiff allowed his attorney to rely on a fabricated document, and where plaintiff recognized that his attorney, acting on his behalf, would be using the fabricated document as a central basis for the complaint, yet he authorized the filing).

When evidence of a fraud on the court is adduced prior to trial, the district court may fashion an appropriate pre-trial remedy to cure the effect of any misconduct, and the choice of remedy is committed to the broad discretion of the trial court. *Fernandez v. Leonard*, 963 F.2d 459, 462 (1st Cir. 1992). In appropriate cases, a sanction for fraud on the court may include dismissal of a case. *Aoude*, 892 F.2d at 1118 (1st Cir. 1989) ("a district court may dismiss a case only when circumstances make such action appropriate."). For example, dismissal is warranted where a plaintiff vigorously prosecutes a suit based upon a document he fabricated, *Aoude*, 892 F.2d at 1118–19, or where a plaintiff deliberately conceals evidence of prior injury in order to

enhance damages.  *See Hull v. Municipality of San Juan*, 356 F.3d 98, 102 (1st Cir.2004).

Dismissal is also warranted where a party has destroyed or concealed evidence, and engaged in

an egregious pattern of misconduct that has hampered proceedings.  *Plasse v. Tyco Elecs. Corp.*,

448 F. Supp. 2d 302, 311 (D. Mass. 2006).  As explained below, both Loudon and Holley have

engaged in litigation conduct that constitutes a fraud on the court.  An order of dismissal of their

Counterclaims is therefore warranted.[1]

### A.      Loudon and Holley Knowingly Advanced A Frivolous Defense and Counterclaim

As part of their defense, Holley and Loudon allege that they were the victim of fraud

perpetrated by Chesterton or third party defendant Anne Brensley.  Specifically, they allege that

the personal guaranty he executed in October 2012, in connection with the $1.2 million loan

advanced by Chesterton to Get It While You Can, LLC ("GIWYC"), was fraudulently doctored

by Brensley as Chesterton's agent after he signed it, and that the guaranty on which Chesterton

has sued does not represent what he agreed to sign.  According to Holley and Loudon, the

guarantee that Chesterton is seeking to enforce was changed by Brensley after they signed it and

before being provided to Chesterton.  They claim that the critical change omitted the language in

paragraph 2 that would have given Holley and Loudon certain rights in the GIWYC collateral if

Chesterton collected on the guaranty.  Loudon testified that there is "no fathomable way" he

would sign a guaranty without the added protections of the collateral language he proposed to be

included in paragraph 2 of the guaranty.  As explained below, the forensic inspection of Holley's

Toshiba laptop proves otherwise, and has exposed their fraud.[2]

---

[1] Chesterton is also entitled to an award of all costs and fees incurred in connection with the
discovery matters that were necessitated by Defendants' fraud.

[2] Chesterton has acted as expeditiously as possible in filing this motion.  However, the forensic
analysis of Holley's computer was ongoing when this matter was scheduled for trial beginning

### *i.*     *Loudon's False Representations to the Court*

In his very first filing in this case, Loudon alleges in a sworn affidavit that:

> Chesterton had agreed to certain terms of the personal guaranty, namely, that if GIWYC could not repay the loan and I or Mr. Holley made such repayment, then we would assume the rights to the collateral that GIWYC pledged to Chesterton. *After agreeing to these terms, Chesterton had me sign the last page of the guarantee, but then separated the last page of the guarantee and attached it to a separate guarantee which omitted the term which gave me and Mr. Holley the right to the collateral if GIWYC went into the default and he had to expend funds to cure the default.*

*See* Dkt. 27-2 (Aug. 12, 2016 Affidavit of John Loudon) (emphasis added).

Legacy and Loudon doubled down on this defense in their Answer and Counterclaim, albeit now blaming Brensley. In the Answer, for example, Loudon and Legacy claim that "*Brensley* then *substituted the original guaranty* prepared by Chesterton's attorney, William Moriarty, *without the provision for exchange of the GIWYC collateral* for performance of the guaranty" and that "*Mr. Loudon did not sign the guaranty which Plaintiff is suing on*." *See* Dkt. 38, p. 6 at ¶ 24 (Answer of Legacy and Loudon).[3]

Loudon and Legacy's Counterclaim contains more of the same. They allege, for example, that Brensley drafted a new guaranty to give Holley and Loudon rights in the GIWYC collateral (see Dkt. 38, p. 11, ¶ 57), and that Brensley committed fraud by switching the revised guaranty with the original guaranty, causing Chesterton to bring suit on a guaranty that Loudon never signed and which omitted terms that Loudon specifically bargained for as a condition for him to sign the guaranty. *Id.*, ¶ 68. This was not a new position for Loudon, who made the same

---

on October 30, 2017, and actual documents responsive to Chesterton's keywords were not produced to Chesterton's counsel until on or about October 12, 2017. *See* Declaration of Michael Perry (hereinafter the "Perry Aff."), at ¶ 12. The two reports generated by the forensic consultant contained nearly 30,000 search hits. Despite the size of the reports, Chesterton has been able to identify key documents that Holley and Loudon never produced during discovery.
[3] While the citations are to Loudon's filings, Holley took the identical position. *See, e.g.,* Dkt. No. 39 (Holley Answer to Complaint), at p. 6, ¶ 24 (alleging Brensley improperly substituted the guaranty that he and Loudon had signed).

allegations in the state court case that Chesterton filed on the guaranty.  For example, at his state court deposition, Loudon testified that:

> There's no way that we would have signed a personal guaranty without the language in No. 2.  ***There's no way, no fathomable way*** that I would obligate myself to pay for a debt and not have the underlying collateral to that in paying off that debt.

*See* Ex. A hereto (relevant portion of Loudon's state court deposition transcript), at p. 126.

When asked about the revised signature blocks, Loudon testified as follows:

> Q.   Your signature appears beneath Mr. Holley's signature, and then on the next page there are two notary blocks in a row.  So would you agree with me that the format of this signature and notary on page CC 1271 is different than 1261?
>
> A.   It appears to be.
>
> Q.   Can you explain the difference?
>
> A.   No, I can't.

*Id.,* at pp. 131-132.

At his deposition in this case, Loudon continue to blame Brensley, and testified that he simply signed what Brensley told him to sign:

> Q.   My question to you, sir, with respect to the last page of Exhibit 19, which is marked Brensley 155 and also bears the Bates Number CC1271, is -- where did you get that page from?
>
> A.   What do you mean?
>
>                   *         *         *
>
> Q.   Before you signed it, where did you get it from?
>
> A.   I would have taken it and cut and pasted from the one that had Number 2 in there, from the additional language, because I was directed by Brensley just to go get the signature page and send her the signature page.

*See* Ex. B hereto (relevant portions of Loudon transcript from Federal Case), at pp. 147-48.

ME1 25934066v.1

### ii.     *The Findings from the Forensic Inspection Expose Loudon's Fraud*

The recently completed forensic examination of Holley's laptop clearly and convincingly debunks Loudon's fraud claim against Chesterton and Brensley.  Located on Holley's laptop are numerous emails which show that (1) it was Loudon, not Brensley, who edited the guaranty into its final form, (2) it was Loudon, not Brensley, who deleted the additional language from paragraph 2, and (3) it was Loudon, and not Brensley, who changed the signature blocks to accommodate the notary that Chesterton required.  *See* Perry Aff., ¶ 12, at Ex. 02.  After Loudon made those changes, Loudon notified Holley that they needed to execute the revised version of the guaranty, which they did on October 11, 2012.

The timing of these emails is critical, and shows that Loudon's entire fraud claim is itself, a fraud:

- On October 11, 2012, at 12:20 PM, Loudon emailed Holley and stated "Byron, we have to do our Personal Guarantee over with a Notary.  I've modified and placed you on a page and me on another.  I'll have done today and sent back to Anne."

- On October 11, 2012, at 12:20 PM, Loudon emailed Holley and stated "Doc attached."  The attachment is entitled "Janis Joplin Personal Guarantee.docx".  The attachment is a four page, Word version of the guarantee, with paragraph 2 edited to remove the language regarding the collateral, but which includes the signature blocks set off on separate pages.

- On October 11, 2012, at 12:52 PM, Holley responded via email to Loudon and stated "Ok. Will do so shortly."

- On October 11, 2012, at 2:36 PM, Ginger Ford emails Holley's signed and notarized guarantee (the same version emailed by Loudon at 12:20 PM) to Anne Brensley and Byron Holley.

- On October 11, 2012, at 3:27 PM, Holley then forwards the Ginger Ford email sent at 2:36 PM to his private email account, bholley077@gmail.com.[4]

---

[4] Holley never produced this email from his gmail account.  Because he forwarded it to his private email account, it should have been be accessible to Holley regardless of the status of his Toshiba laptop.

- On October 11, 2012, at 3:35 PM, Loudon emails to Holley and Brensley a signed and notarized signature page for the guarantee that Loudon had circulated at 12:20 PM and then signed in front of a notary.

- On October 11, 2012, at 5:11 PM, Holley emailed to Brensley another copy of the guarantee with a "highlighted raised seal."

*See* Perry Aff., ¶ 12, at Ex. 02.

Loudon and Holley failed and refused to produce any of these emails, which Chesterton was forced to retrieve from Holley's laptop, on the eve of trial, after numerous motions and hearings.  Based on these emails, it is evident that Loudon's entire defense and counterclaims are based upon a fraud that he has perpetrated on the Court.  Loudon made all of the changes that he blames on someone else, and Loudon and Holley fully recognized and appreciated the terms of the final guaranty, which they freely and knowingly signed on October 11, 2012.  They both wanted the loan to close so they would be paid their finders' fee and could reap the future financial benefits that would flow from the film project.  These emails (discovered on the eve of trial) clearly and convincingly establish that Loudon's and Legacy's entire defense is a sham.[5]

### B. Holley Has Engaged in Fraudulent Discovery Conduct Intended to Delay and Frustrate Chesterton's Ability to Fairly Prosecute Its Claims

Holley has engaged in similar fraudulent conduct.  As this Court is aware, one of Chesterton's principal allegations is that Holley fraudulently misrepresented that he had over $3 million in cash and securities at Wells Fargo Advisors LLC ("Wells Fargo"), which amount would have been sufficient to personally guarantee Chesterton's $1.2 loan.  Holley verified his

---

[5] As a result of Loudon's and Holley's claims about the modified personal guaranty, Chesterton was forced to take unnecessary discovery, including the deposition of Hilliard Lyons, a non-party to this lawsuit.  That deposition confirmed that Brensley could not have, and in fact did not, modify the guarantees after the fact, as Loudon alleged.  The forensic examination has now clearly and convincingly confirmed that is was Loudon, and not Brensley, who modified the guaranty.

ME1 25934066v.1

purported net worth in a financial statement and redacted Wells Fargo "snapshot" of the account

provided to Chesterton in October 2012.  Those statements were a lie, and Holley attempted to

cover his tracks by refusing to produce certain documents and destroying others.

**i.     *Holley's Explanations About the Statement Have Shifted Dramatically During the Litigation***

Holley initially refused to provide any meaningful discovery responses on the subject of

the Wells Fargo snapshot, and when ordered by the Court to provide certain information about

the account, Holley's story shifted dramatically.  For example, in his Answers to Interrogatories,

Holley provided only his "current active account numbers" but failed to provide the other

information requested, and objected to producing any documents related to the account statement

on grounds they had been produced in the state court action (which was false).  After Chesterton

moved to compel, the Court issued an order requiring Holley to produce certain information

about the Wells Fargo account.  *See* Dkt. No. 56.

On April 18, 2017, Holley served supplemental responses to Chesterton's document

requests in which he represented that "[h]e did not retain the original snapshots of his accounts

and was not able to obtain the account numbers or documents from Wells Fargo Advisors."

Holley also stated that he had no other documents responsive to this request.  A copy of the

response is attached as Exhibit C.  Holley never actually provided the account number or the

unredacted account statement, and did not identify the alleged efforts he made to obtain this

information from Wells Fargo.

At the May 8, 2017 status conference, Holley's former attorney represented to the Court

that "the original document does not exist" and made a proffer that Holley would "testify  . . .

that he borrowed money, he put it in the account.  He took a snap shot of the account, and he

closed the account and he gave the money back."  *See* Ex. D (relevant portions of Transcript of

Status Conference), at pp. 36-37.  Holley's attorney also represented that Holley told him "he has spoken to Wells Fargo a number of times, and they don't have the account number."  *Id.* at 39.[6]

At his deposition, Holley then testified that he called someone at Wells Fargo that he knew, asked them to do him a "favor" by transferring $3 million into his existing IRA account for "a very short period of time," took a snapshot of his IRA account reflecting the $3 million, and had the funds transferred back out "as if there was an error, it went into the wrong account in error."  *See* Ex. E (relevant portions of Holley transcript from Federal Case), at 57:24 -58:15, 62:16 to 71:8. That testimony was contrary to his prior discovery responses, representations, and the representations he caused to be made to the Court through his attorney.  As a result of Holley's shifting explanations and refusal to produce the original snapshot statement, Chesterton was forced to conduct unnecessary discovery, including taking the deposition of Wells Fargo Advisors LLC.  That deposition confirmed that Holley's theory of an "accidental transfer" was not feasible without leaving any record of the aborted or accidental transaction.[7]

> ## ii.   *The Findings from the Forensic Inspection Confirm that Holley Refused to Produce Responsive Documents and Deleted Others*

The forensic examination of Holley's laptop located discoverable emails and documents related to the Wells Fargo statement that Holley should have produced, but never did.  For example, the forensic inspection confirmed that a pdf copy of the Wells Fargo snapshot remained

---

[6]  Later in the hearing, Holley's attorney then confirmed that Holley's position was that "at the moment he looked at the screen or printed that, at that moment there was an account . . . and it had $3 million in it . . . and it came from another human being other than himself . . . and then the money left and went back to that other human being, the same person who had given him [sic] . . . and then on some basis the account was closed, or it was determined that it was opened in a mistaken, or the money was transferred by mistake." *Id.* at 65-66.

[7]   When questioned about Holley's theory of the transfer, the Wells Fargo designee testified "We would have a record of activity that would be recorded in a report that shows any activities that were reversed during the course of the business," which is called a "crippled report."  When asked if they looked for a crippled report, he confirmed they had and that "We found no indication of either one of Mr. Holley's accounts on reports from the period of September, October, November."  *See* Ex. F (relevant portions of Wells Fargo dep. transcript), at p. 26-27.

on Holley's computer through June 2016, at which time it was deleted from his computer.  *See*

Perry Aff., ¶¶ 13-14.[8]  Chesterton served Holley with the summons and Complaint in this lawsuit

approximately a month prior.  Holley had an affirmative duty to preserve the pdf copy of the

snapshot, and to produce it during discovery.  Instead, it was mysteriously deleted from his

computer in June of 2016.  *Id.*

C.     **The Forensic Examination Confirms Loudon and Holley Refused to Produce
       Other Relevant Documents and Perjured Themselves**

The forensic inspection located a number of other emails exchanged between Holley and

Loudon in October 2012 concerning Holley's financial statements, the personal guarantees, and

other matters concerning Chesterton's loan, and which both Loudon and Holley failed and

refused to produce during discovery.  *See* Perry Aff., ¶ 12, at Ex. 02 (identifying various emails

located during the forensic inspection).  A number of these emails further establish that Loudon

and Holley provided false testimony about critical documents, including Loudon's testimony

discussed above regarding the allegedly doctored guaranty.  In addition, at his deposition, Holley

testified that he never sent Brensley a signed financial statement dated October 10, 2012, by

which Holley represented that he had nearly $3.5 million of assets.  Holley further testified that

his interrogatory response admitting that he had send the document to Brensley was incorrect.

*See* Ex. E (Holley Tr. at 84:11-12) ("Well, this was -- it was an error.  It's an oversight.  I did not

see this.").  Holley later testified that he simply did not recognize the document.  *Id.* at 84:16-17

("Okay.  I don't -- I don't recognize this document.  I don't recognize C.").  Contrary to Holley's

testimony, the forensic inspection located an email from Holley to Brensley, dated October 10,

---

[8] Holley also informed the Court at the status conference on June 20, 2017, that he likely stopped
using the Toshiba laptop around the end of November 2013, when Legacy purchased a new
computer for him.  *See* Ex. G (relevant portion of transcript from June 20, 2017 status
conference). That was not true, as Holley used the computer through September of 2016.  *See*
Perry Aff., ¶ 15.

2012, at 1:14 PM, which attached the signed financial statement that Holley claims he never sent to Brensley and which he did not recognize.  *See* Perry Aff., ¶ 12, at Ex. 02.  This email directly contradicts Holley's claim that he never made a financial disclosure to Brensley (apart from the Wells Fargo snapshot).

### D.     Severe Sanctions Are Warranted In Response to Loudon's and Holley's Fraud on the Court

Through the conduct described above, both Loudon and Holley have set in motion an unconscionable scheme calculated to interfere with the Court's ability to impartially adjudicate this case. Their conduct has unnecessarily prolonged this litigation, and forced Chesterton to expend substantial legal fees in connection with discovery, third party depositions, preparing and filing various discovery related motions, and attending discovery hearings and status conferences. The Court has also spent a substantial amount of its own time dealing with these same issues.

In *Plasse v. Tyco Elecs. Corp.*, 448 F. Supp. 2d 302, 304–05 (D. Mass. 2006), which was a wrongful employment termination case, the District Court allowed defendant's motion to dismiss based on a theory of fraud on the court.  In justifying its order of dismissal, the Court specifically found:

> Clear and convincing evidence demonstrates that Plaintiff has engaged in extensive and egregious misconduct in this case. First and foremost, he ***deleted or otherwise failed to produce documents that were potentially relevant to this litigation.*** The forensic analysis of Plaintiff's computer and electronic storage devices showed that a number of files with titles containing the words "resume," "cover letter," or "Tyco," existed as recently as November 2004, and have simply disappeared during the course of this litigation. Although EvidentData managed to retrieve certain resume files, which Plaintiff now concedes he "may have deleted," the remaining documents are simply unavailable.

> Not only have these documents been rendered no longer accessible, but ***they disappeared during a period when Plaintiff must have been aware of their relevance.*** Plaintiff was put on notice, as early as November 2004, that various versions of his resume might become an issue in this litigation, and that Defendant was interested in the contents of his computer.

12

*Id.* at 308-09. The Court also considered that the plaintiff lied during his deposition:

> With respect to the deposition testimony, again, the evidence of misconduct is compelling. Plaintiff lied when, asked directly whether he had ever claimed to have received an MBA, he replied, "No." At least three sources directly contradict this statement. First, his handwritten, signed employment application lays claim to an MBA. Second, the Disclosure Resume states that he has an MBA. Third, the Personnel File Resume makes the same claim. Even though Plasse suggested that this resume could have been sent in by a recruiter, he later conceded that it "may have been one that I sent in early on."

*Id.* at 310. The Court dismissed plaintiff's complaint, because "Plaintiff has consistently demonstrated an unwillingness to proceed fairly and openly in this litigation, and has directly flouted this court's authority by destroying or modifying documents after the court specifically invited Defendant to obtain an inspection of Plaintiff's computer and disks." *Id*. at 311.

The facts of this case are striking similar to *Plasse*. Both Loudon and Holley have been exposed through a forensic examination of Holley's computer, completed on the eve of trial, which has revealed clear and convincing evidence that both Holley and Loudon knowingly advanced frivolous claims, defenses or theories of their case, have perjured themselves during depositions, through affidavits, or through direct statements to the Court, and who have spoliated key evidence or flatly refused and failed to produce other evidence. Accordingly, a sanction in the form of an order of dismissal of all counterclaims is warranted.

## II.    SANCTIONS ARE ALSO WARRANTED BASED ON HOLLEY'S AND LOUDON'S SPOLIATION OF EVIDENCE

"[S]poliation is the intentional, negligent, or malicious destruction of relevant evidence." *Townsend v. American Insulated Panel Co.*, 174 F.R.D. 1, 4 (D.Mass. 1997). It is well-established that a district court has the inherent power to sanction a litigant where evidence is improperly lost, damaged, or destroyed, and when necessary to prevent the non-offending party from suffering unfair prejudice. *See Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444,

446 (1st Cir.1997).  A district court has broad discretion in choosing an appropriate sanction for spoliation, although the sanction "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  *Sharp v. Hylas Yachts, LLC*, 872 F.3d 31 (1st Cir. 2017).  Possible sanctions include "dismissal of the case, the exclusion of evidence, or a jury instruction on the 'spoliation inference.'" *Townsend*, 174 F.R.D. at 4.  Of particular importance when considering the appropriateness of sanctions is the prejudice to the non-offending party, and the degree of fault of the offending party.  *Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir. 1997).[9]

Holley and Loudon both had a duty to preserve evidence.  Both were on notice of Chesterton's claims as early as June 1, 2014, when GIWYC LLC failed to repay Chesterton's $1.2 million loan, and certainly by no later than June 24, 2014, when Chesterton notified Holley and Loudon of GIWYC's default.  Chesterton also filed suit against Holley and Loudon in Suffolk Court Superior Court on July 29, 2014, and filed this suit in May 2016.  Accordingly, both Holley and Loudon had a duty to preserve potential evidence, including relevant communications between the two of them, by as early as June 2014.

### A.    Holley and Loudon Spoliated Documents and Emails

Despite their duty to preserve evidence, the forensic inspection of Holley's computer confirms that critical emails and documents authored by Holley and Loudon have never been produced, and that others were deleted.  *See* Perry Aff., ¶¶ 13-17.  These include, for example, emails that directly undercut Loudon's frivolous claim that Brensley and/or Chesterton fraudulently doctored his personal guaranty after he signed it (*see* Section I.A, infra), and emails

---

[9]  An order of dismissal would also be appropriate under Fed. R. Civ. P. 37(e)(2)(C), which permits dismissal when a party intentionally fails to preserve certain electronically stored information.

that show Holley lied at his deposition when he testified that he never sent his October 10, 2012 financial statement to Anne Brensley (*see* Section I.B, infra).  Holley never produced these emails, even though they were on his Toshiba laptop which he was using through the end of September 2016 (which is contrary to his representation to the Court that he stopped using the computer at some point in 2013).

The forensic inspection also confirms that Holley continued to use his laptop through the end of September 2016, and that certain critical documents, including a snapshot of the Wells Fargo account statement, remained on his computer at least through June of 2016, before it was deleted by unknown means.  Holley's conduct has not only violated his duty to preserve relevant documents, he severely prejudiced Chesterton's ability to prove its case and created a genuine risk of an erroneous judgment in his favor.  By removing critical electronic records from the scope of discovery, Holly cherry-picked the emails and documents that most helped his defense, and produced those documents instead (mostly in the state court case).  It is likely that Holley deleted other emails and documents from his computer, and which were discoverable and relevant to the claims alleged here by Chesterton.  Chesterton is unlikely to ever know the full extent of those deletions, and has therefore been severely prejudiced.  *See* Perry Aff., ¶ 17.

Loudon also failed to produce the emails located by the forensic inspection and which he either authored or received.  Based on the conduct described above, and since Loudon claims he produced all relevant documents, it is reasonable to conclude that Loudon either knowingly decided to withhold critical emails and documents from discovery, or that he deleted his emails and other records once he learned of Chesterton's claims, all in an effort to interfere with Chesterton's ability to prosecute its claims.

ME1 25934066v.1

### B.      Holley Spoliated Text Messages

Holley also spoliated text messages between him and Loudon that he refused to produce and appear to now be unavailable.  Despite a Court Order requiring Holley to produce  "a paper or electronic copy of each and every text message between Holley and Loudon during the time period June 1, 2012 to October 31, 2012" (*see* Dkt. 131), Holley only produced an electronic copy of a string of text messages between himself, John Loudon, and Ann Brensley.  These were not responsive to the Order, as the texts were not from 2012, and were not between himself and Loudon.[10]

Holley's failure to produce the responsive text messages has violated prior orders of this Court and amounts to spoliation of evidence.  As previously noted, both Holley and Loudon had notice of Chesterton's claims as early as June 2014, and they therefore should have preserved all text messages they exchanged with each other on the subject of Chesterton's loan.  At his deposition in the State Court case, Holley testified that in 2015, he switched cell phones, but that all data from his old phone was ported to his new phone.  Holley also confirmed that he and Loudon communicated via text message and that his messages concerning GIWYC "would have come over to his new phone."  *See* Ex. H (relevant portions of Holley's state court deposition transcript), at pp. 26-28.  Contrary to that testimony, Holley served an Affidavit in this case in which he states, under oath, that he replaced his old cell phone in either December 2013 or January 2014, and gave his old cell phone to his daughter, who erased the data and sold the phone.  *See* Ex. I (Holley Affidavit and Letter to Court).  Holley made no mention of this at his state court deposition.  Holley also states that his provider, Verizon, does not have copies of his

---

[10] On August 10, 2017, Chesterton's counsel demanded that Holley and Loudon produce any responsive text messages by the close of business on August 14, 2017.  Holley failed to produce the text messages.  Loudon's counsel later informed Chesterton's counsel that Loudon no longer had possession, custody or control of the responsive text messages.

old text messages.  *Id.*  In other words, Holley has provided conflicting accounts of the status of his text messages, both under oath.

Under the doctrine of spoliation, the Court is permitted to impose sanctions and remedies for the destruction of evidence in the course of civil litigation.  *See Townsend*, 174 F.R.D. at 4. Here, both Holley and Loudon failed to preserve the relevant text messages, despite a duty to preserve them.  That failure to preserve has likely deprived Chesterton of critical evidence, and prejudiced Chesterton's ability to prove its case.

### C.    Chesterton is Entitled to an Adverse Inference Instruction

Based on this conduct, Chesterton is entitled to sanctions in the form an adverse inference instruction, which is appropriate "when a party fails to produce [evidence] that exists or should exist and is within [the party's] control." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 20 (1st Cir. 2009).  Chesterton is entitled to an instruction that this Court has found that Holley and Loudon have conspired together to destroy documents, emails and text messages concerning the Chesterton guaranty, that one of those documents was the financial snapshot from Wells Fargo which was deleted after Holley and Loudon were served with the Federal action, that Holley and Loudon have not produced all of the materials that should have been produced in this case and that under the circumstances, an inference is warranted that had those documents, emails and text messages been produced, they would be adverse to the claims and defenses that Holley and Loudon are presenting to the court and jury, if there is one.

### <u>CONCLUSION</u>

Holley and Loudon's conduct throughout this litigation has prejudiced Chesterton, interfered with Chesterton's ability to prosecute its claims, has interfered with Chesterton's efforts to obtain legitimate discovery, and has unnecessarily prolonged this litigation and wasted

ME1 25934066v.1

valuable resources of both Chesterton and the Court.  Holley and Loudon's conduct has also

interfered with the Court's ability to impartially adjudicate this matter, and constitutes a fraud on

the court.  For these reasons, Holley and Loudon should be sanctioned in the form of a dismissal

of all Counterclaims, an award of fees and costs for Chesterton for all discovery related matters,

an order precluding Loudon and/or Holley from offering into evidence any documents or emails

located through the forensic inspection of Holley's laptop, and, if there is a jury trial, a strong

adverse inference instruction such as Chesterton has submitted above.

<div style="margin-left: 40%;">

CHESTERTON CAPITAL LLC
By its attorneys,


*/s/ Nicholas W. Allen*
William A. Zucker, Esq., BBO # 541240
Amy B. Hackett, BBO # 676345
Nicholas W. Allen, BBO # 663409
McCarter & English LLP
265 Franklin Street
Boston, MA  02110
617-449-6500
617-607-9200 (fax)
wzucker@mccarter.com
ahackett@mccarter.com
nallen@mccarter.com

</div>

October 20, 2017

## CERTIFICATE OF SERVICE

I, Nicholas W. Allen, certify that on this 16th day of October, 2017, this document was electronically filed with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), pursuant to Local Rule 5.4(C).

<div style="margin-left: 40%;">

*/s/ Nicholas W. Allen*
Nicholas W. Allen, Esq.

</div>