UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHESTERTON CAPITAL, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 16-10848-LTS |
| ) | |
| BYRON L. HOLLEY, JOHN C. LOUDON, ) | |
| and LEGACY POINT CAPITAL LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| JOHN C. LOUDON and LEGACY POINT ) | |
| CAPITAL LLC, ) | |
| ) | |
| Third Party Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ANNE BRENSLEY, ) | |
| ) | |
| Third Party Defendant. ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

December 8, 2017

SOROKIN, J.

Before the Court are the claims remaining in this action following resolution of pretrial

motions and the Court's Order of Default against Defendant Byron Holley ("Holley") (Doc. No.

182). These claims include (1) Plaintiff Chesterton Capital LLC's ("Chesterton") claims against

Defendants John Loudon ("Loudon") and Legacy Point Capital LLC ("Legacy Point Capital")

for fraud and violation of Mass. Gen. Laws Ch. 93A ("Chapter 93A") [1]; (2) Loudon and Legacy Point Capital's counterclaims against Chesterton for fraud and negligence; (3) Loudon and Legacy Point Capital's third party claims against Anne Brensley ("Brensley") for fraud and negligence; and (4) Brensley's cross-claims against Loudon and Holley for fraud and violation of Chapter 93A. Following a bench trial on these claims, the Court "find[s] facts specially and state[s] its conclusions of law separately" herein as required by Federal Rule of Civil Procedure 52(a). Further, the Court awards damages on these claims as well as on Chesterton's claims against Holley as explained herein.

I.      FINDINGS OF FACT

        A.      Loudon, Holley, and Legacy Point Capital

        The Defendants in this case are Loudon, Holley, and Legacy Point Capital, a limited liability company that Loudon and Holley jointly own and manage.

        Defendant Loudon is a sophisticated businessman and an accountant by trade. After graduating from Western New England University, Loudon worked for Coopers & Lybrand in Springfield, Massachusetts for three years as an associate, preparing tax returns and conducting due diligence on projects. He subsequently worked at his mother's law practice for a year and a half, as a controller of a mechanical company in the Atlanta, Georgia area for four and a half years, and as Chief Financial Officer for a master plan community in Hawaii for five years. In 2003, he returned to Atlanta and began working on real estate deals for individual clients. He

---

[1] Counsel for Legacy Point Capital conceded at the Final Pretrial Conference that Legacy Point Capital was responsible for a judgment entered against Holley because Holley undertook the actions at issue in this case in furtherance of, and in the course of his position as Managing Member of, Legacy Point Capital. The Court accordingly enters judgment against Legacy Point Capital on Chesterton's claims. However, in an abundance of caution, the Court here separately assesses the merits of Chesterton's claims against Legacy Point Capital.

remains in this line of work.  Loudon has passed the Certified Public Accountant exam but has

not pursued the designation further.  In his career, Loudon has participated in at least a dozen

deals, in connection with which he has at various times retained counsel, negotiated contracts,

and supervised other people.

In or around 2009, Loudon met Defendant Holley through a mutual friend in Atlanta.

Holley is an investment professional residing in Lexington, Kentucky.  Until around 2007,

Holley had been the manager of the Lexington branch of A.G. Edwards & Sons, a brokerage

firm that during the financial crisis of 2007-2008 merged into Wachovia and eventually was

acquired by Wells Fargo & Co.  Holley had been employed by A.G. Edwards for approximately

ten years.  Loudon understood: that Holley had been registered with the Financial Industry

Regulatory Authority (FINRA) as a broker and with the Securities and Exchange Commission

(SEC) as an investment adviser; that a number of investors had brought complaints through

FINRA against Holley related to representations that he had made about investments; and that

Holley no longer retained these registrations.  Loudon discussed these FINRA disputes with

Holley in the course of becoming business partners in 2009.  In 2010, Holley and Loudon

founded Silverstone Capital, through which they unsuccessfully sought to finance film projects.

Also around this time, Loudon loaned Holley $45,000.  Loudon received no security for this

loan.  Loudon understood from Holley that Holley needed the funds for personal expenses and

that Holley had "lost everything" in his divorce.

In March 2012, Holley and Loudon formed Legacy Point Capital, an investment banking

and advisory firm.  Loudon fronted approximately $100,000 of his own funds and obtained a

$10,000 loan from a friend to pay for start-up costs and temporary office space.  Holley did not

contribute any assets toward the founding of Legacy Point Capital. Nonetheless, Holley drew monthly allowances from Legacy Point Capital.

From Legacy Point Capital's inception in 2012, Holley and Loudon have been its sole members and shareholders. They hold equal ownership interests in the business. Legacy Point Capital holds itself out as having raised over a billion dollars, based broadly on Loudon and Holley's combined deal experiences. However, Legacy Point Capital has generated its modest income mostly through the sale of life insurance policies. It has never reported a profit. While Legacy Point Capital has at times engaged individuals for marketing and information technology services, it has never had employees. Despite generating revenue, it has never filed any income tax returns or produced K-1s to Loudon and Holley.

Together in August 2012, Loudon and Holley formed Legacy Point Entertainment LLC ("Legacy Point Entertainment") with the specific purpose of financing film projects. They are the sole members and equal shareholders of that entity as well. While Loudon and Holley at times transacted business under the name Legacy Point Entertainment, Loudon and Legacy Point Capital acknowledged at trial that Legacy Point Entertainment acted on behalf of, and in furtherance of the business of, Legacy Point Capital in the course of the events giving rise to the lawsuit before the Court.

B.    The "Get It While You Can" Project

In 2012, film producers Robert Katz and Ron Terry (the "Producers") engaged Legacy Point Capital to obtain financing for the production of a film about the legendary singer Janis Joplin, which was to have been titled "Get It While You Can." Legacy Point Capital agreed to raise $10 million of equity funding for the $20 million film budget. In order to raise the funds, Legacy Point Capital prepared marketing materials describing the investment opportunity and

details about the planned film.  On or around June 30, 2012, Legacy Point Capital entered into a

Feature Film Letter of Intent with the Producers.  Doc. No. 165, ¶ 6-8.

As an initial step, Loudon and Holley sought the help of someone with experience in the

film industry who could act as a financial advisor and conduct diligence on the film project.

Holley located Third Party Defendant Brensley from an internet search.  Brensley was at that

time Managing Member of Boston Financial Trust Advisors ("BFT").  She agreed to act as a

broker in Legacy Point Capital's search for investors.[2]  At no time was Brensley a member of

Legacy Point Capital or a partner of Holley or Loudon.

Between August and October 2012, the parties failed to locate investors to provide any of

the $10 million of equity funding for the film.  GIWYC soon faced pre-production costs and

certain immediate expenditures required for the film project to remain viable.  GIWYC engaged

Legacy Point Capital and Brensley to secure $1.2 million in interim financing, for which Legacy

Point Capital and Brensley would be entitled to a $60,000 broker fee.  In September 2012,

Brensley approached John P. Walsh, the sole principal and owner of Chesterton, about providing

a $1.2 million bridge loan to the film project.  Walsh, the president of a chain of beauty spas,

founded Chesterton in 2008 to make investments and loans to real estate developers and other

business ventures.

Walsh spoke with the Producers about the project by early October 2012.  The Producers

reported that they had raised $10 million in equity for the film and that they were pursuing

investors interested in providing an additional $10 million.  They offered as collateral for a loan

---

[2] In August 2012, Legacy Point Capital, BFT, and the Producers, under the entity named "Get It While You Can LLC" (herein, "GIWYC"), entered into a Co-Financing Services Agreement, under which Legacy Point Capital and BFT were entitled to (1) "[a]n amount equal to five and one half percent (5.5%) of the Financing raised" by Legacy Point Capital and BFT and (2) "5% of [GIWYC's] 'Net Proceeds' from the Picture in perpetuity […] multiplied by the same percentage as [Legacy Point Capital and BFT's] portion of the Financing[.]"  Ex. 13.  No payments were ever made pursuant to the Co-Financing Services Agreement.

from Chesterton primarily tax credits from the state of Georgia and an assignment and copyright mortgage of the screenplay. To Walsh, the collateral was of insufficient value to cover the loan principal and accrued interest for the proposed bridge loan. Thus, Walsh told the Producers that Chesterton would require a personal guaranty of the loan. He specified that the guarantors should have personal assets of at least two to three times the loan's value. The Producers told Walsh that they could not meet his financial requirements for guarantying the loan. From Chesterton's perspective, the proposed loan deal was over.

Holley, Loudon, and Brensley had been aware that Chesterton would require a personal guaranty for its loan but initially had believed that the Producers would provide it. Katz informed Holley otherwise and on October 7, 2012 urged by email, "Since you're [sic] position in the film is solidified via this interim investment and it will be paid off BEFORE the picture goes into production, you should have no issue with guaranteeing it." Ex. 18. Loudon and Holley initially responded that they did not consider providing a guaranty to be in their best interest.

Brensley next initiated a conference call between Walsh and Loudon and Holley. Walsh testified at trial that Loudon and Holley expressed their confidence in the film and pointed to the success of a biopic of the singer Johnny Cash, stressing that, whereas Cash appealed mainly to American fans, Joplin captivated audiences both in and outside of the United States. Loudon and Holley also told Walsh that they were in discussions with two potential investors about providing the remaining $10 million of equity financing. Walsh commented that, since they were so confident of the film's success, Loudon and Holley should be willing to personally guaranty a loan. He also conveyed to them that he typically requires guarantors to have a net worth of at

least two to three times the loan's value.[3]  Loudon and Holley told Walsh that they would discuss the guaranty and get back to him.

In subsequent conversation with Loudon and Holley, Brensley emphasized favorable findings from her due diligence of the film.[4]  Loudon and Holley agreed that they would personally guaranty a $1.2 million loan from Chesterton.  Walsh instructed Brensley to have Loudon and Holley provide personal financial statements and attestations about any claims against them for his diligence purposes.

C.     Communications with Chesterton

Attorney William Moriarty represented Chesterton in negotiations of the deal documents. Brensley acted as an intermediary between Moriarty and GIWYC's attorney, Richard Garzilli. All communications that Loudon and Holley had with Chesterton flowed through Brensley.  Two concurrent exchanges that occurred between October 9 and October 11, 2012 are relevant to the claims in this case.  First, the parties traded drafts of the deal documents memorializing the transaction, including the guaranty that Holley and Loudon ultimately signed.  At the same time, Holley and Loudon compiled and sent Chesterton personal financial information as proof of their ability to perform under the guaranty.

i.     *Signing of Guaranty*

Attorney Moriarty drafted the documents that became the Production Loan Deal Memorandum (the "Deal Memo"), the Secured Promissory Note (the "Note"), and the Personal

---

[3] Loudon denied at trial having been notified of any amount of combined personal assets that Chesterton required as assurance for a loan guaranty.  However, the Court credits Walsh's testimony that he did in fact communicate to both the Producers and the Defendants his conditions for agreeing to invest in the film project, especially in light of testimony from Moriarty and Brensley corroborating Walsh's approach that a guaranty should be supported by personal assets of two to three times the loan amount.  See also infra n.8.
[4] At trial, Loudon alleged that, in this conversation, Brensley also represented to Loudon and Holley that she would assume 50% responsibility for repayment of the guaranty in the event of default.  The Court rejects Loudon's professed understanding of Brensley's position in the transaction.  He has offered no evidence supporting a finding that Brensley agreed specifically to assume 50% of the guaranty obligation, and his testimony was incredible.

Guaranty of Payment (the "Guaranty"). On October 9 at 6:05 p.m., Moriarty circulated "final versions of the documents for signature" in <u>PDF</u> format to Garzilli and Brensley. Ex. 19. Brensley forwarded these documents to Loudon and Holley at 7:14 p.m., noting: "The personal guaranty definitely needs to be changed in some parts, but I leave it to you guys to let me know what those changes will be…." Ex. 20. She followed this email with another at 8:16 p.m. asking Loudon and Holley to confirm receipt of the documents. <u>Id.</u>

Holley and Loudon objected to the terms of the Guaranty, under which Chesterton would retain the loan collateral upon seeking repayment from them following a default. To this end, Brensley and Garzilli attempted to negotiate a side letter agreement (the "Side Letter") between GIWYC and Legacy Point Entertainment, "[i]n consideration for Legacy Point Entertainment […] entering the Personal Guaranty of Payment[,]" under which Legacy Point Entertainment would have assumed Chesterton's rights to the collateral in the event that Chesterton exercised its rights under the Guaranty. Ex. 88.

Moriarty and Garzilli subsequently spoke about certain changes to the documents. Following that conversation, Moriarty emailed Garzilli and Brensley at 5:34 p.m. on October 10 with updated documents, noting "no change" with respect to the Guaranty. Ex. 27. At 6:40 p.m. on the evening of October 10, Brensley circulated to Loudon and Holley the updated versions of the Deal Memo and the Guaranty in <u>PDF</u> format and noted that the Producers were signing the Side Letter. Ex. 31. At 6:44 p.m., Brensley emailed them again, writing:

> I just wanted to quickly acknowledge our agreement today that I will be taking on an obligation to participate in the repayment to John Walsh upon default. It is my intention to enter into an express agreement with you both collectively that will state that intent no later than Friday, October 12, 2012.

Ex. 32.

Meanwhile, Loudon and Holley asked Brensley to propose additional language to the Guaranty that would grant them rights to the loan collateral in the event that Chesterton exercised its rights under the Guaranty. Brensley converted the <u>PDF</u> version of Moriarty's draft Guaranty into a <u>Word</u> version and created a new draft reflecting Loudon and Holley's preferences. She added to Section 2 ("Rights of Lender in Event of Default") language that she borrowed from Garzilli's draft of the Side Letter:

> In the event that Lender exercises the Guaranty for repayment of the Loan, Guarantor shall assume all of the rights of Lender under the Deal Memo, the Security Agreement and Copyright Mortgage, dated as of October 9, 2012 and the Security Agreement for Tax Credits, dated as of October 9, 2012, including any rights of indemnification under such Agreement that Lender may have.

Ex. 33. She also changed the party name from Legacy Point Capital to Legacy Point Entertainment. In this revised guaranty (the "Loudon Guaranty"), Brensley inadvertently deleted a line from Section 1 of Moriarty's original draft. She retained the form of the signature pages from the initial draft, such that one page held signature blocks for Holley and Loudon and the next page held corresponding notary blocks. Brensley sent the Loudon Guaranty in <u>Word</u> format to Loudon and Holley at 7:49 p.m. on October 10. <u>Id.</u> Holley and Loudon signed and returned the Loudon Guaranty but did not have it notarized. Ex. 35.

At 8:05 that evening, Katz sent Garzilli, Brensley, and Moriarty signed copies of the Deal Memo, the Note, and the Side Letter, as well as documents related to the security for the loan. Ex. 88. Brensley then proposed the signed Loudon Guaranty to Moriarty, Walsh, and Walsh's son, John Walsh, Jr., by email at 9:56 p.m., noting:

> VERY IMPORTANT, you will notice in section 2 that there is added wording borrowed from the separate letter between the Producers and the Guarantors. The Guarantors did not want to cause any waves and it was explained to them that John was going to acknowledge that very letter and had actually reviewed it all ready [sic], but they felt more comfortable having the language in the letter as well as in the Personal Guaranty.

> IF this is an issue for some reason, please let us know and they will sign without the language!

Ex. 35.

Chesterton rejected Loudon and Holley's bid for rights to the collateral in the event that Chesterton called on the guaranty. Walsh further indicated to Brensley that Chesterton would not enter the deal if GIWYC and Legacy Point Entertainment executed the Side Letter.[5] Moriarty informed Brensley by phone that Chesterton would not countersign the Loudon Guaranty. He instructed Brensley by email on October 11 at 12:11 p.m., "Please have the Guaranty re-executed in the Guaranty's original form without the additional language." Ex. 37.

Brensley communicated Chesterton's position to Loudon and Holley and relayed that they needed to sign the original version of the Guaranty.[6] At 12:20 p.m. that day, Loudon emailed Holley and explained:

> Byron, we have to do our Personal Guarantee over with a Notary. I've modified and place [sic] you on a page and me on another.
>
> I'll have done today and sent back to Anne.
>
> Thanks, John.

Ex. 89. Immediately after sending that email, Loudon sent Holley a <u>Word</u> version of the Guaranty from which he had removed the collaterals rights from Section 2 of the Loudon Guaranty. Ex. 90. This new version (herein, the "Chesterton Guaranty") was substantially identical to Moriarty's original version, with three exceptions. First, like the Loudon Guaranty,

---

[5] Despite not producing a countersigned version of the Side Letter at trial, Loudon testified that he and Holley executed the Side Letter and understood the Side Letter to have gone into effect. He further insisted that Brensley had never told them that Walsh opposed the Side Letter. However, the Court credits the testimony from Brensley and Walsh and finds that the Defendants were aware that Walsh would not recognize the Side Letter as part of the loan transaction. The Court further finds that the Side Letter was never executed.

[6] Loudon testified at trial that he did not remember Brensley telling Loudon and Holley that Chesterton rejected the new language, but that there was "probably a call or conversation" on the morning of October 11 about the Guaranty signatures needing to be notarized. The Court rejects Loudon's testimony as incredible.

the Chesterton Guaranty referenced Legacy Point Entertainment rather than Legacy Point Capital. Second, the Chesterton Guaranty omitted the same line from Section 1 that the Loudon Guaranty inadvertently had omitted (confirming that Loudon modified the only Word version of the Guaranty in his possession—the Loudon Guaranty—rather than inadvertently selecting the original draft to modify as he testified at trial). Third, Loudon had modified the signature pages to the Chesterton Guaranty so that Holley's signature block and corresponding notary block appeared on one page, while Loudon's signature block and notary block appeared on the next. Id. Holley replied at 12:52 p.m., "Ok. Will do shortly." Ex. 91.

Holley signed and notarized the Chesterton Guaranty and transmitted it to Brensley through a personal financial advisor at 2:35 p.m. Ex. 49. Brensley forwarded Holley's signature to the Chesterton Guaranty to Walsh at 2:57 p.m. Id. Walsh in turn forwarded it to Moriarty, who notified Brensley at 3:52 p.m. that the notarization was illegible. Ex. 44. Brensley alerted Holley, who at 5:11 p.m. returned his signature page with the notary's seal highlighted. Ex. 94. Meanwhile, Loudon signed and notarized the Chesterton Guaranty signature page and sent it to Brensley at 3:35 p.m. Ex. 50. Brensley forwarded Loudon's page to Moriarty at 4:25 p.m. Id. Moriarty and Walsh then confirmed that Chesterton would proceed with the loan.

   ii.    *Personal Financial Representations*

While the parties coordinated the transaction documents, Loudon and Holley compiled documentation for Walsh of their financial ability to provide the Guaranty. For his part, Loudon provided a personal financial statement to Brensley at 6:22 p.m. on October 10. His statement showed a total net worth of $626,279. Ex. 28. Brensley sent the statement to Walsh and Moriarty at 6:27 p.m. Id. At 6:28 p.m., she forwarded to Walsh and Moriarty an attestation from

Loudon reading, "This email is to attest that I have no liens, encumbrances, bankruptcy or criminal actions against me." Ex. 29.

Earlier that afternoon at 1:14 p.m., Holley emailed to Brensley a "financial statement letter" that purported to summarize his assets as of that date. The letter stated:

Below is a synopsis of my current assets:

1. Securities portfolio, apporixmately [sic] $3 million
2. Personal assets, approximately $100 thousand
3. Residential assets, approximately $400 thousand
4. Liabilities, approximately $40, [sic] thousand.

Ex. 25. Brensley forwarded this letter to Walsh, who replied that he would need to see a more detailed report of Holley's assets. Later that afternoon, at 4:54 p.m., Holley emailed Brensley an "account screenshot" bearing the Wells Fargo Advisors LLC corporate logo and boilerplate disclosures. Ex. 26. The screenshot purported to be page 1 of 7 of an account statement with line-item cash and securities amounts. It represented that Holley's account held total securities of $2,964,598.33 and a total account value of $3,029,724.12. At 5:57 p.m., Holley provided to Brensley an "attestment" that stated, "Per our conversation, I have never declared bankruptcy, don't have any personal liens, or any criminal or civil lawsuits." Ex. 28. Brensley forwarded the attestation and account screenshot to Walsh at 6:14 p.m. Id.

Holley's account screenshot bore no resemblance to his actual financial situation. Moreover, Loudon knew or should have known that a truthful depiction of Holley's assets would not assure Chesterton that Holley and Loudon could repay Chesterton's loan in the event that GIWYC defaulted. By October 2012, Loudon was well aware that Holley had no substantial assets or other sources of income. Holley by then had divulged that his divorce from his ex-wife had left him essentially broke. The business partnership was not profitable. Holley had neither repaid any amounts of the $45,000 personal loan from Loudon nor contributed his own assets to

their business. Nonetheless, Loudon claims that he did nothing to inquire into the financial statement that Holley submitted or the reason for Walsh's acceptance thereof.

        D.    <u>Default</u>

Chesterton disbursed the loan funds to GIWYC on October 13, 2012 by wire payment of $1.2 million to Brensley, who acted as escrow agent and distributed the funds to GIWYC and Legacy Point Capital. Chesterton did this only after receiving agreement in writing to the Chesterton Guaranty form and the financial statements from Loudon and Holley.

In February 2013, Holley and Loudon (both on behalf of Legacy Point Capital) entered into a Venture Agreement with Brensley's new company, BFT Advisors, LLC. The Venture Agreement envisioned cooperation between the parties "to finance an on-going slate of feature films and/or structure the financing for entertainment projects secured through the joint efforts of the Parties and to direct all film related projects that either party anticipates participation in, into the collaboration." Ex. 59. However, the parties undertook no subsequent film financing deals together under the Venture Agreement. Additionally, at no time following the close of the Chesterton loan did Brensley, Loudon, or Holley pursue the "express agreement" for Brensley to participate in any obligation to repay the Chesterton loan that Brensley's October 10, 2012 email had suggested.

The Deal Memo provided for GIWYC to repay the loan's principal and interest premium no later than April 9, 2013. Ex. 88. However, GIWYC exercised its right under Deal Memo Section 6.1 to extend the due date for an additional 180 days, subject to an additional 2.5% interest premium on the loan's outstanding principal for every 30-day period of extension (the "First Extension"). During the First Extension, GIWYC encountered trouble with retaining the rights to Joplin's music. Chesterton reluctantly loaned an additional $500,000 to GIWYC in July

2013 in an effort to secure the music rights for filming. This loan had a repayment date of October 15, 2013. Katz personally guaranteed this loan. Brensley facilitated the loan, received a broker fee of $25,000 from Chesterton, and again served as escrow agent upon disbursement. Loudon and Holley declined to participate in the follow-on loan. Ex. 63.

In October 2013, when the First Extension expired, GIWYC had not repaid Chesterton. Walsh asked Brensley, as the broker, to send notices of default to the principals of GIWYC and Legacy Point Capital. Ex. 100. Chesterton subsequently extended the deadline on both the $1.2 million bridge loan and the $500,000 follow-on loan until December 15, 2013 (the "Second Extension"). When the loans had not been repaid on December 15, Moriarty mailed formal notices of GIWYC's default to Loudon and Holley on January 2, 2014. Ex. 65. Notably, in response neither Loudon nor Holley asserted any right to the collateral for the underlying loan nor suggested that Brensley bore an obligation to share in the repayment of the Guaranty. Chesterton then extended the repayment deadline one last time, to June 1, 2014 (the "Third Extension").

Despite the follow-on loan and the numerous deadline extensions, neither GIWYC nor Legacy Point Capital raised any of the $10 million required to produce the film. GIWYC defaulted on the loans on June 1, 2014. Moriarty mailed Holley and Loudon another formal notice of default and demand for payment on June 24, 2014. Ex. 68. Again, neither Loudon nor Holley asserted any right to the collateral or claimed that Brensley bore an obligation to share in the repayment.

E.    Litigation

Chesterton sued GIWYC on the Deal Memo in state court and recovered a judgment against GIWYC of $5,208,972.87. GIWYC has no funds with which to pay this judgment. In

separate litigation, Chesterton also obtained a judgment against Katz under his guaranty of the $500,000 loan.

Holding an uncollectable judgment against GIWYC, Chesterton brought suit on the Guaranty in state court, alleging that Loudon and Holley breached that agreement as well as the attendant covenant of good faith and fair dealing. Loudon and Holley answered and asserted counterclaims for breach of the covenant of good faith and fair dealing, fraud inducing them to enter the Guaranty, and violation of Chapter 93A. Loudon and Holley also filed a third party complaint against Brensley for breach of contract, indemnification, breach of fiduciary duty, negligence, and fraud. In their third party complaint, Loudon and Holley attached the Chesterton Guaranty as the version of the Guaranty that they had entered into with Chesterton. In response to the third party complaint, Brensley asserted claims of fraud and violation of Chapter 93A against Loudon and Holley. That suit is pending in the Suffolk Superior Court Department of the Massachusetts Trial Court. Doc. No. 1 at 9. At some point several months into those proceedings, Holley and Loudon backtracked on their asserted Guaranty version and claimed that Brensley switched the Guaranty version that Chesterton received without their knowledge. In an order on a summary judgment motion issued in January 2, 2017, the Superior Court found that Loudon and Holley were "bound by the admissions and allegations contained in their answer and third-party complaint where the defendants admit executing the [Chesterton Guaranty]." Doc. No. 122-6 at 8.

Based on information produced during discovery in the state court litigation—specifically, information showing that the financial representations and account statement submitted by Holley were fraudulent—Chesterton separately brought this action in federal court alleging that Defendants engaged in unfair and/or deceptive acts and practices in violation of

Chapter 93A and made misrepresentations of material fact about their financial wherewithal in order to induce Chesterton to invest in the GIWYC project. Consistent with the counterclaims and third party claims in the state court litigation, Loudon and Legacy asserted claims against Chesterton and Brensley pertaining to Brensley's role in the GIWYC project on January 2, 2017. Notwithstanding the estoppel in state court, Loudon and Legacy Point Capital again took the position that Brensley had switched the version of the Guaranty that Loudon and Holley had signed, Doc. No. 40 at 4, and pressed this position continually. Brensley brought cross-claims against Loudon and Holley.

Prior to trial in this action, the Court granted summary judgment for Brensley on Loudon and Legacy Point Capital's third party claims for fraud based on their Guaranty-switching theory, breach of fiduciary duty, breach of contract, and indemnification. The Court also entered judgment for Chesterton on Loudon and Legacy Point Capital's claims asserting vicarious liability for Brensley's alleged Guaranty-switching and breach of fiduciary duty. At trial, the Court allowed Loudon and Legacy Point Capital's motion for dismissal of their own Chapter 93A claims against Chesterton and Brensley.

Despite proceeding with separate counsel in the federal case, Loudon and Holley continue to work together, most recently on an ongoing real estate development project in Lexington. Loudon testified at trial that he only continues to work with Holley for purposes of meeting obligations incurred in the course of that project. He also testified that he makes frequent attempts to contact Holley, but that Holley does not communicate with Loudon.

The Court next makes specific findings as to certain factual questions presented in the course of this action and raised at trial.

    i.       *Signing of the Chesterton Guaranty*

Throughout this action, Loudon knowingly offered several false explanations as to how the Chesterton Guaranty came to bear his signature. In an affidavit attached to Defendants' Motion to Dismiss Chesterton's claims, Loudon first alleged that Chesterton affixed his Loudon Guaranty signature page to the Chesterton Guaranty:

> After agreeing to [Loudon's proposed] terms, Chesterton had me sign the last page of the guarantee, but then separated the last page of the guarantee and attached it to a separate guarantee which omitted the term which gave me and Mr. Holley the right to the collateral if GIWYC went into the default and he [sic] had to expend funds to cure the default.

Doc. No. 27-2 at 2.

Loudon subsequently blamed Brensley for fraudulently switching the Guaranty versions after he signed the Loudon Guaranty. Loudon and Legacy Point Capital's Answer and Counterclaims allege that "Brensley then substituted the original guaranty prepared by Chesterton's attorney, William Moriarty, without the provision for exchange of the GIWYC collateral for performance of the guaranty" and that "Mr. Loudon did not sign the guaranty which Plaintiff is suing on." Doc. No. 38 at ¶ 24. Loudon made this same allegation against Brensley in a deposition in the state court litigation:

> There's no way that we would have signed a personal guaranty without the language in No. 2. There's no way, no fathomable way that I would obligate myself to pay for a debt and not have the underlying collateral to that in paying off that debt.

Doc. No. 161-1 at 126.

The Court outright rejects any allegations by Defendants that they did not execute the Chesterton Guaranty or that any Guaranty-switching occurred. Loudon and Holley attached to their state court third party complaint the signed Chesterton Guaranty and identified it as the version of the Guaranty that they executed. Ex. 74. On this basis, the Court found Defendants to be estopped from arguing that they did not sign and submit the Chesterton Guaranty. The Court

accordingly granted Brensley summary judgment on Loudon and Legacy Point Capital's third party claim that she switched the Guaranty versions. Doc. No. 164 at 7. Furthermore, Holley's personal financial advisor produced the physical version of the Guaranty that Holley had directed her to scan and send to Brensley. That version matched the same Chesterton Guaranty that Loudon and Holley admitted in state court to having executed. Ex. 85. Loudon alternatively theorized, in his answer to Brensley's Motion for Summary Judgment, that Brensley had "tricked [Loudon] into signing something other than what was intended." Doc. No. 127 at 3. In its Order on Summary Judgment, the Court found that Loudon and Legacy Point Capital had failed to offer any factual support for this theory. Doc. No. 164 at 7-8.

Defendant Holley produced no emails in state or federal court litigation, although he did use both Gmail and Legacy Point Capital email accounts during the events giving rise to this litigation. Leading up to trial, the Court ordered a forensic examination of Holley's Toshiba laptop computer in light of Holley's failure to meet his discovery obligations. On October 12, 2017, the forensic examiner produced a number of responsive files on Holley's computer that had not been produced during discovery, including certain emails from October 11, 2012 between Loudon and Holley pertaining to the execution of the Guaranty. Exs. 89-91. None of the Defendants had produced these emails in discovery in either the state or federal case. Despite being either a sender or recipient of each of these emails concerning a critical, disputed issue, Loudon claims that he revisited his computer and located these emails only after the forensic examination revealed their existence. Loudon belatedly produced these files during the week of trial.

The October 11, 2012 emails confirm Brensley's explanation of the Chesterton Guaranty, which has not changed throughout this litigation. The emails show, consistent with Brensley's

credible and honest testimony, that Loudon edited the <u>Word</u> version of the Loudon Guaranty that Brensley had previously circulated; that <u>Loudon</u> created the Chesterton Guaranty by removing the rejected language while retaining name changes and the accidental line omission; that Loudon altered the signature blocks so that he and Holley could have the Guaranty notarized from separate locations; that Loudon shared this Chesterton Guaranty with Holley for completing and submitting; and that Loudon also submitted a signature page to this Chesterton Guaranty, not the Loudon Guaranty.  <u>Id.</u>

Even after the forensic examination unearthed these emails, Loudon persisted in asserting that he was not responsible for the Chesterton Guaranty that he and Holley submitted.  At trial, Loudon retreated to the position that he inadvertently amended the signature blocks to the original Guaranty draft rather than that he modified the Loudon Guaranty.  When pressed by the Court as to why he selected that version, Loudon replied: "I have no idea.  It was a mistake.  It was a flat-out mistake."[7]  Loudon maintained throughout trial that he had not actually agreed to the Chesterton Guaranty.  Since trial, Loudon has re-asserted in an affidavit:

> Loudon, [sic] signed the agreement believing that he would have access to the collateral in the case of default as presented to him by Brensley and GIWYC multiple times in emails via the acknowledgment of the Side Letter by GIWYC and Chesterton.  Without these representations, Loudon would have never signed the Personal Guarantee.  Once again, a mis-representation by Brensley.

---

[7] The Court rejects as incredible the idea that Loudon selected and modified the original version by mistake.  Loudon first advanced this explanation at trial, and it is the latest in a series of shifting explanations.  The evidence establishes that Loudon received first a PDF version of the first draft of the Guaranty (which did not have the language that Loudon claims he wanted regarding the collateral) and then a Word version, the so-called Loudon Guaranty (which did have the language that he claims he wanted).  Loudon had no other copies of the Guaranty.  He made no error in selecting a file.  In order to send Holley the Word document that became the submitted Chesterton Guaranty, Loudon necessarily selected the Word file and <u>deleted</u> the language that he now claims he wanted.  Selecting the PDF version would not have accomplished what he now claims he intended to do.  Further, the omitted line and the change in Legacy Point party name common to the Loudon Guaranty and Chesterton Guaranty confirm that Loudon did not start with the original PDF version.

Doc. No. 205 at ¶8. Ultimately, Loudon's myriad alternative theories are unavailing against the clear documentary evidence, Brensley's credible testimony, and his own shifting, incredible testimony.

Further, the Court finds that Loudon at all times knew that he signed the Chesterton Guaranty rather than any other version of the Guaranty. The notice of default and demand for payment that Moriarty sent to Loudon and Holley on June 24, 2014 (Ex. 68) excerpted Section 2 of the Chesterton Guaranty. Thus, Loudon was on notice that Chesterton understood Section 2 of the Guaranty to not provide Loudon and Holley rights to collateral. Nonetheless, Loudon never contacted Moriarty to contest the version of Section 2 that Moriarty understood to govern at the time of default. Finally, as Loudon admitted at trial, at no point following the default did the Defendants take any steps to assert the rights to collateral that they allegedly thought that they enjoyed under the Loudon Guaranty.

In short, Loudon and Holley acceded to Chesterton's terms freely, voluntarily, and knowingly. They proceeded accordingly, acting in conformity with their understanding, until in the course of discovery, they realized that Brensley's emails from before January 2013 were unavailable.[8] They then concocted claims that Brensley deceived them and fraudulently switched the form of Guaranty, theories which they advanced in this action and which the Court now rejects.

### ii. Holley's Financial Statements

Having defaulted in this action, Holley did not appear at the bench trial. Chesterton presented video testimony from Holley's deposition. In connection with this testimony,

---

[8] As a result of a split from her associate in the BFT business in January 2013, Brensley relinquished the bostonfinancialtrust.com domain name and lost access to her previous email account. The Court credits Brensley's testimony that she contemporaneously alerted Holley and Loudon of her loss of access to prior emails in the course of working with them at that time.

Chesterton offered financial records obtained from Wells Fargo indicating that, on October 10, 2012, Holley held a mere $5,125.77 in a checking account (held jointly with his ex-wife) and $101.34 in an IRA. Exs. 56-58.

In this action and in the state court litigation, Holley offered shifting testimony as to how his account screenshot came to reflect assets in excess of $3 million. At a status conference on May 8, 2017, his former counsel made a proffer that Holley would testify that he borrowed money and used it to open the account, took the snapshot of the account, and then returned the money and closed the account such that Wells Fargo would determine that the account was opened by mistake and would therefore keep no record of it. Doc. No. 86 at 3-4. However, in deposition testimony offered at trial, Holley claimed that he had called a former colleague at the Lexington Wells Fargo branch; that he had several former colleagues at that office who were willing to perform a favor for him, but that he does not remember the individual that he contacted; and that the former colleague temporarily transferred funds into his account for a portion of the day so that they would be reflected on Holley's account statement until the Wells Fargo employee reversed the transaction. Thus, regardless of its credibility, Holley's own explanation of the account screenshot admits to fraud.

Holley's explanation is not credible. A Wells Fargo representative explained in deposition testifimony that, contrary to Holley's understanding, even a reversed transaction would have generated a "cripple report." Wells Fargo has no record of a cripple report for Holley's account. Further, the representative testified to being unfamiliar with the form of account statement that Holley provided. Ex. 86.

The Court accordingly concludes that Holley doctored the account screenshot that he submitted to Chesterton. Holley knowingly misrepresented his assets on his financial statement

in order to induce Walsh's acceptance of his Guaranty and Chesterton's making of the bridge loan. Holley was aware of his financial constraints and acted in order to conceal the fact that he did not have the financial wherewithal to guaranty the loan.

Further, when Chesterton sought to enforce Holley's repayment obligation in state court and brought related charges in federal court, Holley knowingly failed to produce documents that he was duty-bound to produce. The forensic examination of Holley's laptop revealed that files entitled "accountsscreenshot0001.pdf" and "accountsscreenshot0001(2).pdf" were created on October 10, 2012 and deleted from the computer on or about June 20, 2016. Doc. No. 162 at ¶¶13-14. The federal action was filed on May 9, 2016 and served on May 11, 2016. The Court concludes that Holley affirmatively attempted to cover up his fabrication of the Wells Fargo account statement in the course of this action.

iii.    *Loudon's Knowledge of Holley's Misrepresentations*

At trial, no party contested that Holley fraudulently misrepresented his financial information to Chesterton. However, Loudon testified that he and Holley never discussed each other's financial situation, the statements that they submitted Chesterton, or the combined net worth that they claimed to have. In her refreshingly candid testimony, Brensley acknowledged that she never talked to either Holley or Loudon about the other's statement because she felt that it would be improper to do so. There is no direct evidence that Loudon knew what information Holley submitted, and Loudon denies that Holley ever informed him of the content of Holley's submission.

The Court finds that Loudon knew or was at least on notice well before 2012 of Holley's financial situation and his general veracity. Loudon entered into a partnership with Holley despite the latter's inability to contribute any assets to their ventures. He was aware of Holley's

prior FINRA disputes over misrepresentations to investors. He knew that Holley's finances were illiquid enough to require a loan from Loudon for personal expenses and reimbursements and monthly allowances from Legacy Point Capital for business expenses.

Further, Loudon knew that in order to close the loan deal with Chesterton, he and Holley needed to present a combined net worth that would assure Walsh of their ability to repay the loan. Despite showing a net worth of only roughly half of the loan principal of $1.2 million, Loudon testified at trial that he did not know whether his assets alone would have been insufficient for Chesterton to accept the Guaranty. The Court credits neither this testimony nor his testimony that he never consulted Holley about whether their assets together would satisfy Walsh.[9] At the time that he executed the Guaranty, Loudon had substantial business experience. He understood the obvious—that the security for the loan (an interest in the script and tax credits generated from filming the movie) had little value if financing for the movie was unavailable. He knew that the entire point of the Guaranty was to make Chesterton whole in the event that GIWYC defaulted, which would only be possible if Loudon and Holley's net worth substantially exceeded the amounts payable on the $1.2 million loan.

The Court finds that Loudon, a sophisticated businessman, did in fact confer with Holley about their complementary financial statements rather than leave the math up to luck; that he understood that his and Holley's statements would suggest to Walsh that Chesterton's loan was backed by guarantors possessing assets of three times the loan value; and that he knew that Holley's actual finances could not possibly have assured Walsh of their qualifications as

---

[9] Chesterton advanced the argument that the parties followed an accepted rule of thumb requiring a guarantor to have assets of at least three times the amount of the guaranty; thus, under this theory Loudon and Holley's combined assets of $3.6 million (adding the $3 million securities represented by Holley to the $600,000 net worth reported by Loudon) suggest coordination in presenting their personal financial statements. Brensley similarly testified that a high risk project such as the one at issue here would have required a showing of "hard money" of at least twice the loan amount.

guarantors. Three more reasons support the Court's conclusions. First, Loudon and Holley were partners in October 2012, as they had been for several years. The Court rejects the notion that they failed to discuss either the Guaranty or the terms of their financial statements with each other; rather, the Court finds that they discussed these topics. Second, the extensive evidence of coordinated efforts by Loudon and Holley to recharacterize the Chesterton Guaranty as illegitimate corroborates the Court's finding as to Loudon's knowledge at the time of the misrepresentations. Third, the Court rejects as incredible Loudon's testimony on this topic.

 *iv.*  *Brensley's Role in the Transaction*

 The Court credits Brensley's testimony in its entirety as honest and forthright and concludes that she neither shaded nor exaggerated her testimony.

 Based on the evidence before it, the Court finds that, contrary to Loudon and Legacy Point Capital's claim, at no point did Brensley hold herself out to be more than a broker for transactions such as this one. Loudon and Legacy Point Capital offered no evidence indicating that Brensley claimed to have more experience in film financing than that which she actually had. Further, Brensley was not prohibited from advertising the fact that she had a law degree simply by virtue of not being admitted to the bar or practicing as a lawyer.

 The Court further finds that at no time was Brensley an agent of Chesterton. Loudon and Legacy Point Capital alleged that the $25,000 broker fee that Chesterton paid Brensley on the $500,000 loan reflect an agency relationship. They also pointed to Brensley's service as a disbursement agent in the transaction and her later circulation of the notices of default from Chesterton. They further offered communications between Brensley and Walsh about subsequent projects that the two discussed potentially working together on. These thin reeds do not support a finding that Brensley worked as Chesterton's agent. Rather, they are consistent

with Brensley's testimony that she acted only as a broker in relation to the deals discussed at trial and herein. The Court further credits Walsh's straightforward testimony that Brensley has never been an agent of Chesterton and that Brensley at all times during this transaction acted as a broker.

F.      Summary

At bottom, Loudon, Holley, and Legacy Point Capital wanted Chesterton's loan to GIWYC to proceed. They agreed to personally guaranty the loan, offered a fraudulent financial statement from Holley to induce Chesterton's acceptance of the Guaranty, and, in the end, assented to Chesterton's insistence that Chesterton, and not Loudon and Holley, would retain the collateral upon a default by GIWYC. Then, when Chesterton sued, Loudon and Holley advanced a Guaranty-switching defense that they knew to be false, and they supported that defense by omitting from their document productions the obvious, relevant, and material emails that exposed the defense as a lie. When pressed for documents, Holley vigorously resisted producing these emails or his laptop. He ultimately produced his laptop with extensive damage, which the Court concludes he inflicted intentionally in an effort to thwart discovery of the emails. Loudon for his part advanced an ever-shifting "explanation" for both the Guaranty and the failure to produce the emails. None of his explanations are credible. He knew about the fraudulent financial statement from the outset, advanced the known-to-be-false defense that Brensley switched the Guaranty versions, and lied about the defense as well as his failure to produce the documents. I further find that Loudon and Holley coordinated the Guaranty-switching defense and the decisions not to produce the emails.


II.     CONCLUSIONS OF LAW

For each claim in this action, the Court applies the familiar civil standard in determining whether the party bringing the claim has established liability.  Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 192 (1st Cir. 2012) ("The ordinary rule in civil cases is proof by a preponderance of the evidence[.]"  (Citing Herman & MacLean v. Huddleston, 459 U.S. 375, 387 (1983))).  The Court enters judgment in favor of Chesterton on its claims and on the counterclaims against it; for Brensley on Loudon and Legacy Point Capital's third party claims against her; and for Loudon on Brensley's cross-claim against him.

A.      Chesterton's Claims Against Defendants

 Chesterton seeks damages for fraudulent misrepresentation and for violation of Chapter 93A by Holley, Loudon and Legacy Point Capital.  The Court already has entered an Order of Default as to Defendant Holley on these claims (Doc. No. 182), which binds Legacy Point Capital.

i.      *Fraudulent Misrepresentation*

Sitting in diversity, the Court looks to the substantive law of the forum state (here, Massachusetts).  Under Massachusetts law, to prevail on its claim for fraudulent misrepresentation, Chesterton must establish that Loudon and Legacy Point Capital "made a false representation of material fact with knowledge of its falsity for the purpose of inducing [Chesterton] to act thereon, and that [Chesterton] reasonably relied upon the representation as true and acted upon it to [its] damage."  Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458 (Mass. 2002).

Chesterton satisfies its burden of proof on its fraud claim.  Here, neither Loudon nor Legacy Point Capital disputes that Holley submitted to Chesterton financial statements that were falsified.  The misrepresentations in the financial statements were of material fact to Chesterton,

which requested the statements in order to confirm the very net worth that Holley grossly overstated. Holley fabricated his statement in order to induce Chesterton to accept the Guaranty and to make the loan, for which he and Loudon received a broker fee and secured potential interests in the film's profits. Chesterton reasonably relied upon the misrepresentation. Loudon's assets alone would have been inadequate to assure Chesterton of Loudon and Holley's ability to guaranty the loan. Without Holley's statement, Chesterton would not have proceeded with making the loan. Further, Chesterton was reasonable in expecting that an account statement purporting to come from Wells Fargo contained truthful account information. Chesterton made the loan because it believed that the guarantors had sufficient means, and Chesterton has not been repaid upon default because the guarantors in fact had lied.

"Under Massachusetts law, corporate officers are personally liable for any tortious activity in which they personally participate." Frontier Mgmt. Co. v. Balboa Ins. Co., 658 F.Supp. 987, 991 (D.Mass. 1986). Loudon contends that he did not participate in, encourage, or even have knowledge of Holley's misstatement of Holley's net worth, and that he thus should not be responsible for Holley's fraud. The Court has found otherwise—namely, that Loudon was aware of Holley's financial condition, conferred with Holley in advance of submitting financial statements to Chesterton, knew of Holley's misrepresentation on his statements, allowed Chesterton to accept the Guaranty and make the loan despite the untruthful statements, and coordinated with Holley to attempt to avoid liability under the Guaranty upon GIWYC's default.

Further, "under Massachusetts law actionable misrepresentation may occur without the speaker's knowledge that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are available to the speaker." Acushnet Federal Credit Union v. Roderick, 26 Mass.App.Ct. 604,

605 (Mass. 1988). Even were the Court to credit Loudon's defense that he had not been aware at the time of either the content of Holley's statements or Holley's financial situation—which it does not—Loudon would have willfully disregarded the truth or falsity of Holley's statements by not seeking to verify the information with Holley. <u>See</u> Massachusetts Continuing Legal Education, Inc., <u>Mass. Super. Ct. Civil Practice Jury Instructions</u>, §20.1 Misrepresentation (2016).

In any event, Loudon knew that, although he and Holley provided separate financial statements ahead of signing the Guaranty, the information that was relevant to Chesterton was their combined net worth, which they provided for purposes of demonstrating joint ability to guaranty the $1.2 million loan. Thus, Loudon's omissions with respect to his and Holley's combined net worth constituted fraud in the same way that Holley's affirmative misrepresentation did. The Court accordingly enters judgment for Chesterton against Loudon as to this claim.

Legacy Point Capital has conceded that, during all events giving rise to this action, Holley and Loudon acted as its Managing Members. "Persons who control a corporation may be held liable *along with the corporation* for torts committed by them in connection with corporate business." <u>Instant Image Print Shop, Inc. v. Lavigne, Keating, Halstead, Inc.</u>, 1998 WL 201424, *3 (Mass.App.Div. 1998) (emphasis added). Legacy Point Capital therefore is liable on Chesterton's fraud claim as a result of both the Order of Default that the Court entered against Holley and the Court's finding of liability against Loudon.

*ii.* *Chapter 93A*

In order to prevail on its Chapter 93A claim, Chesterton must prove the use or employment by Loudon and Legacy Point Capital of an unfair method of competition or an

unfair or deceptive act or practice.  Mass. Gen. Laws ch. 93A, § 11; Arthur D. Little, Inc. v.

Dooyang Corp., 147 F.3d 47, 56 (1st Cir.1998).  Plaintiffs must also establish a loss of money or

property caused by the violative conduct.  Mass. Gen. Laws ch. 93A, § 11; Arthur D. Little, 147

F.3d at 56.

       In determining whether a practice violates Chapter 93A, the Massachusetts courts look to

"(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or

other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or

unscrupulous; [and] (3) whether it causes substantial injury to consumers[.]"  Mass. Eye & Ear

Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir.2005) (citing PMP Assocs.,

Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)).

       Chesterton predicates its Chapter 93A claim on common law fraud arising from the

misrepresentations discussed above.  "When a claim that a defendant is liable under Chapter 93A

is based on a tort theory, it follows that an officer can be held individually liable if he personally

participated in unfair or deceptive conduct that violated Chapter 93A."  Alves v. Daly, No. CA

12-10935-MLW, 2013 WL 1330010, at *8 (D.Mass. 2013).  For the same reasons that

Defendants Loudon and Legacy Point Capital are liable for fraud, the Court also enters judgment

for Chesterton on its Chapter 93A claim.

     *iii.*    *Damages*

       As a result of the Court's finding of liability against Loudon and Legacy Point Capital for

fraud and violation of Chapter 93A, Chesterton is "entitled to all damages it had suffered as a

proximate result of … [the] misleading representations."  VMark Software, Inc. v. EMC Corp.,

37 Mass.App.Ct. 610, 619 (1994).  "[T]hat other factors … might also have contributed to the

loss does not preclude recovery, so long as the reliance on the false representation was an

operating factor[.]"  <u>Reisman v. KPMG Peat Marwick LLP</u>, 57 Mass.App.Ct. 100, 113-114 (2003).

Chesterton seeks to recover amounts owed under the Deal Memo and Note on its $1.2 million bridge loan, as well as its $500,000 follow-on loan.  Its requested damages break down as follows:

**$1.2 Million Loan Principal and Non-Premium Interest**

| | |
|---|---|
| Loan made on October 10, 2012 | $1,200,000 |
| Annual 17% interest (October 2012 through October 2017) | $1,020,000 |
| Additional interest 23 days to November 2, 2017 | $     12,855 |
| **TOTAL** | $2,232,855 |

**Premium Interest for First Extension** (additional 2.5% of principal for every 30 days from May 2013 through October 2013)                       $   180,000

**Total Amount Owed Directly on $1.2 Million Loan**        $2,412,855

**<u>$500,000 Loan (Principal Only)</u>**                       $   500,000

**TOTAL DAMAGES**        $2,912,855

The parties dispute whether Defendants are liable as to Chesterton's losses on its $500,000 follow-on loan.  Chesterton asserts that, but for Defendants' fraudulent inducement of the initial loan, Chesterton would not have been required to make the follow-on loan to shore up its chances of recovery on the initial loan.  Loudon and Legacy Point Capital maintain that Chesterton made the $500,000 follow-on loan independently, such that Chesterton's losses on that loan were not a proximate result of actions of Legacy Point Capital and Loudon.

<u>Ross Systems Corporation, Sang (Lewis M.) v. Ross (Stanley E.)</u>, 1994 WL 89015 (Del. Ch. February 15, 1994) is instructive.  There, the plaintiff had made an initial investment in a

company based on misrepresentations by his co-owner of the company as to the research underlying their venture. The plaintiff subsequently made additional loans to fund the company's operations even after discovering the defendant's fraud and closing the company to new business. The plaintiff claimed damages based on these additional loans, arguing that, had the defendant been truthful, the plaintiff would have closed the company at the outset and avoided his later loans. The court in Ross Systems concluded that (i) at the time of the fraud, the defendant did not know and did not have reason to believe that his misrepresentations would induce the plaintiff to continue to loan money throughout the company's life span, even after their business relationship deteriorated, and (ii) that the plaintiff had made the additional loans in the face of known, substantial risks and after becoming aware of the fraud that had induced the initial loan. Thus, the court found that the defendant's misrepresentations were not a proximate cause of the plaintiff's losses on the additional loans to the company. Id. at *2-4.

Chesterton's follow-on loan similarly resulted from intervening considerations. Defendants did not know and could not have foreseen that their fraudulent procurement of Chesterton's $1.2 million bridge loan would cause Chesterton to lend additional amounts to GIWYC without Defendants' involvement. Loudon and Holley declined to facilitate the $500,000 follow-on loan, and Chesterton did not look to them to guaranty it. Further, Chesterton made the follow-on loan based on a business calculation on which Defendants' fraud had no bearing. The Court credits Walsh's testimony that Chesterton loaned the additional $500,000 in order to keep the GIWYC project viable and to preserve the possibility of recovering on the $1.2 million loan that the Defendants fraudulently induced. However, knowledge of Holley and Loudon's misrepresentation would not have made Chesterton more or less likely to make the follow-on loan; the follow-on loan did not serve to bolster Holley and Loudon's ability to

perform on Guaranty for the $1.2 million loan, and Holley and Loudon's financial wherewithal was not relevant to Chesterton's likelihood of recovery on the $500,000 follow-on loan.

Moreover, Chesterton understood the risks of making the follow-on loan. Chesterton was aware that the film project had not yet attracted equity investors and that GIWYC required immediate expenditures to address pressing legal and business challenges. Chesterton obtained a guaranty from Katz, whose financial situation was known to Chesterton. The follow-on loan reflected only Chesterton's assessment of the film project's prospects and Katz's financial wherewithal. The follow-on loan therefore cannot be legally attributed to the Defendants.

The Court concludes that, but for Defendants' fraud, Chesterton would not have made the $1.2 million bridge loan. Thus, Chesterton is entitled to $2,412,855, representing the principal, non-premium interest, and interest premiums payable on the $1.2 million loan.

Section 9(3) of Chapter 93A provides that "if the court finds for the petitioner, recovery shall be in the amount of actual damages … or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two...." As discussed above, the Court finds that Defendants' deception with respect to the financial statements and the loan Guaranty was willful and knowing. Based on Defendants' willful misconduct, the Court finds that trebling damages is appropriate. Consequently, the Court awards treble damages of $7,238,565, as well as attorney fees and costs pursuant to Chapter 93A.

B.    Loudon and Legacy Point Capital's Claims Against Chesterton

Loudon and Legacy Point Capital's counterclaims allege three counts of fraud and one count of negligence against Chesterton.

i.    *Fraud*

Loudon and Legacy Point Capital first claim that Chesterton is vicariously liable for misrepresentations that Brensley allegedly made about her professional qualifications. Second, they assert that Chesterton is vicariously liable for alleged statements of intent that Brensley made about participating in the obligation to repay the loan. Third, they claim that Brensley misled them as to the likely consequences of a default on Chesterton's loan by GIWYC.

By their own admission, Loudon and Legacy Point Capital base these claims of fraud against Chesterton on an agency relationship between Chesterton and Brensley. The Court finds no support whatsoever for such a relationship. The Court therefore enters judgment for Chesterton on each of these counterclaims.

*ii.*     *Negligent Hiring*

Loudon and Legacy Point Capital also claim that Chesterton was negligent in employing Brensley. The Court reiterates that at no time did Chesterton engage Brensley as an employee, agent, or otherwise. Accordingly, the Court enters judgment for Chesterton on this counterclaim as well.

C.     <u>Loudon and Legacy Point Capital's Claims Against Brensley</u>

Loudon and Legacy Point Capital's third party claims allege three counts of fraud and one count of negligence against Brensley.

*i.*     *Fraud*

Loudon and Legacy Point Capital's Third Party Complaint alleges that Brensley is directly liable for the same fraud claims for which they alleged that Chesterton was vicariously liable. First, they allege that Brensley misrepresented her professional background and qualifications to induce them to engage her for film financing projects. The Court finds that Loudon and Legacy Point Capital have failed to present any evidence that Brensley gave them

33

any description of her experience beyond that which was truthful. Loudon and Legacy Point Capital thus have failed to meet their burden as to this claim.

Second, Loudon and Legacy Point Capital allege that Brensley induced Loudon to sign the Guaranty by falsely representing that she would assume 50% of any repayment obligation thereunder. They offered no evidence supporting a finding that Brensley agreed specifically to assume 50% liability other than Brensley's email of October 10 at 6:44 p.m. in which she acknowledges that they had agreed that she would "be taking on an obligation to participate in the repayment to John Walsh upon default." Ex. 32. The Court finds this email ambiguous and unsupported by any subsequent agreement. Brensley conceded at trial that she intended in her email to signal to Holley and Loudon her desire to participate in the film fundraising on equal footing with them. The Court credits Brensley's testimony that she sought only greater ownership in the deal. The Court does not find credible Loudon's unfounded contention that Brensley agreed to assume a 50% guaranty repayment obligation, especially in light of Loudon and Holley's inaction on this subject following Brensley's email and their later receipt of the notices of default. Accordingly, Loudon and Legacy Point Capital have not met their burden on this claim, either.

Third, Defendants allege that Brensley fraudulently induced Loudon to sign the Guaranty through false statements about the likelihood of default and Chesterton's likely recourse. Loudon testified that Brensley told him and Holley not to worry about the potential repayment obligation under the Guaranty because Chesterton would solely avail itself of the collateral for the loan and not call upon the Guaranty. He testified that because Brensley had been in the middle of the transaction and had done the diligence on the film project, her assurances induced him to sign the Guaranty. Brensley testified that she never provided this assurance. The Court

credits Brensley's testimony, rejects Loudon's testimony as incredible, and finds that Loudon

and Legacy Point Capital have failed to establish their claim by a preponderance of the evidence.

  *ii. Negligence*

  Finally, Loudon and Legacy Point Capital allege that Brensley was negligent in her

business dealings with them. "Before liability for negligence can be imposed, there must first be

a legal duty owed by the defendant to the plaintiff, and a breach of that duty proximately

resulting in the injury." <u>Dos Santos v. Coleta</u>, 465 Mass. 148, 154 (2013) (quoting <u>Davis v.

Westwood Group</u>, 420 Mass. 739, 742–43 (1995)).

  Loudon and Legacy Point Capital contend that Brensley "[a]s both a partner and joint

venture [sic]" owed them a "duty to exercise due care and sound business judgment when

conducting business with them as part of their joint venture." Doc. No. 40 at 6-7. Loudon and

Legacy Point Capital have failed to establish that Brensley was either their partner or a joint

venturer with respect to the loan. However, Brensley may have owed them a duty relevant to

their negligence claim by acting as their agent. <u>See</u> <u>Wilson v. James L. Cooney Ins. Agency</u>, 66

Mass.App.Ct. 156, 161 (2006) (noting that an agent "undeniably had certain duties to" a

principal, including "us[ing] due care in the implementation of the agency … and in carrying out

instructions of the principal-client." (citing <u>Bicknell, Inc. v. Havlin</u>, 1193 Mass.App.Ct. 497, 500

(1980)).

  Regardless, Loudon and Legacy Point Capital otherwise fail to establish any conduct by

Brensley constituting a breach for purposes of negligence. The Court has rejected their

assertions that Brensley induced Loudon to execute the Guaranty or that she switched Guaranty

signature pages or otherwise misled Loudon as to the Guaranty version that he signed. Their

claim that Brensley was negligent in suggesting that Loudon personally guaranty a personal

Guaranty for a $1.2 million loan in exchange for a mere $15,000 broker fee is particularly disingenuous in light of the potential future share of film profits that drove Loudon and Holley to fraud. The Court enters judgment for Brensley accordingly.

        D.      <u>Brensley's Cross-Claims Against Loudon and Holley</u>

Brensley asserts cross-claims for fraud and violation of Chapter 93A against Loudon and Holley.

        *i.*      *Fraud*

Brensley alleges that Holley and Loudon made misrepresentations to her on which she relied to her detriment in introducing Holley and Loudon to Chesterton. At trial, Brensley did not advance her claims that Loudon and Holley failed to disclose Holley's "FINRA issues and his past dealings with clients and misrepresentations" or that they overstated Holley's prudence and sophistication as an investment manager. Doc. No. 88 at ¶¶28-32. The Court thus only considers her entitlement to damages based on the forged Wells Fargo account snapshot that Holley provided to Brensley.

As damages, Brensley seeks only her state court attorney fees. Whatever the merits of her claim, the state court attorney fees are not a consequence of the fraud that she alleges in her cross-claim. Thus, judgment must enter against her.

        *ii.*     *Chapter 93A*

Brensley alleges numerous deceptive acts or practices by Loudon and Holley. However, at trial Brensley did not advance her allegations that Loudon and Holley engaged her to pursue a "suspicious funding source," that they induced her to enter a fraudulent "standby letter of credit deal," that they failed to disclose to her that they were involved in a lawsuit regarding a fraudulent letter of credit deal, and that they "knowingly introduced projects that were suspicious

and fraudulent, but represented them as strong projects to induce [Brensley] to find financing for the projects." Doc. No. 88 at ¶¶34-37 and 39. The Court evaluates her claims that Loudon and Holley expressed to Brensley that they were going to try to get out of their current obligations with Chesterton, stated that they did not know about the defaults on Chesterton's $1.2 million loan, and misstated their obligations as guarantors. Id. at ¶¶36 and 38-39.

Brensley has not met her burden of proof as to her Chapter 93A claim. Even if Brensley established by a preponderance of the evidence that Holley and Loudon deceptively sought to shirk or recharacterize their Guaranty obligations, she has not demonstrated that she suffered a loss of money or property as a result of these deceptive acts. The most that she alleges is that she, Loudon, and Holley "possibly los[t] an investment of $1,200,000" as a result of Holley and Loudon's avoidance of their obligations to Chesterton. Id. at ¶¶36. However, Brensley has already received her broker fee on Chesterton's bridge loan, and she has not explained how she, Loudon, and Holley were to receive an investment stake in the amount of that loan. The Court accordingly enters judgment for Loudon on this claim.

E.     Assessment of Damages Payable by Holley

Finally, the Court assesses damages arising out of Holley's default on Chesterton's claims against him. Because Holley and Loudon acted jointly and on behalf of Legacy Point Capital, Holley is jointly and severally liable for the same damages award that the Court enters for Loudon and Legacy Point Capital on Chesterton's fraud and Chapter 93A claims.


III.     CONCLUSION

For the foregoing reasons, the Court determines that Chesterton has met its burden to establish fraud and violation of Chapter 93A by Loudon and Legacy Point Capital; that Loudon

and Legacy Point Capital have failed to establish that Brensley acted as Chesterton's agent for purposes of their claims against Chesterton; that Loudon and Legacy Point Capital have not met their burden to establish fraud and negligence by Brensley; and that Brensley has not met her burden to establish fraud and violation of Chapter 93A against her by Loudon and Holley. Holley, Loudon, and Legacy Point Capital are jointly and severally liable for damages to Chesterton of $7,238,565 million. Chesterton shall submit a proposed form of judgment within seven days encompassing all claims, along with their calculation of attorney fees and costs pursuant to their Chapter 93A claims. Chesterton's Motion for Sanctions (Doc. No. 161) remains under advisement pending the results of the forensic examination of Loudon's laptop computer.

Within seven days, Chesterton shall provide a status report regarding the forensic examination of Loudon's laptop computer.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge